UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

| | | |
|---|---|---|
| SAMUEL P. COGDELL | ) | |
| | ) | |
| V. | ) | NO. 2:14-CV-268 |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security | ) | |

## REPORT AND RECOMMENDATION

This matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation. Plaintiff's claim for disability insurance benefits under the Social Security Act was administratively denied following a hearing by an Administrative Law Judge ["ALJ"]. Plaintiff has filed a Motion for Judgment on the Pleadings [Doc. 15], and Defendant Commissioner has filed a Motion for Summary Judgment [Doc. 20].

The sole function of this Court in making this review is to determine whether the findings of the Commissioner are supported by substantial evidence in the record. *McCormick v. Secretary of Health and Human Services,* 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Commission*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*,

745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Commissioner's decision must stand if supported by substantial evidence. *Liestenbee v. Secretary of Health and Human Services,* 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

Plaintiff alleged that his disability onset date was November 6, 2012. His insured status expired on December 31, 2013. In order to be entitled to disability insurance benefits, he must establish that he was disabled under the Social Security Act on or prior to that date. Plaintiff is now 64 years of age, and was 61 on his alleged onset date, a "person of advanced age" under the regulations. He has a high school education and past relevant work experience as a sales and marketing representative.

Plaintiff's medical history pertinent to his claim for benefits is set out in the Commissioner's brief as follows:

> Plaintiff saw urologist Jason Carter, M.D., in November 2012 for an enlarged prostate (Tr. 270-79). After biopsy testing, Dr. Carter diagnosed prostate cancer (Tr. 267).
> The next month, Plaintiff saw oncologist John Boys, M.D. to discuss radiation therapy for his prostate cancer (Tr. 205). Dr. Boys noted that Plaintiff's cancer was localized to the prostate with no evidence of metastatic disease (Tr. 205). Dr. Boys also opined that Plaintiff was otherwise "quite a healthy man with only nondiabetic neuropathy, sleep apnea[,] and some asthma" (Tr. 205). Over the coming months, Plaintiff underwent hormonal therapy (with Lupron injections) and external beam radiation therapy (Tr. 253, 255, 258).
> In January 2013, Plaintiff saw Scott Jay, M.D., for an evaluation of atrial fibrillation (Tr. 215-17). Dr. Jay noted that Plaintiff adhered to a low-fat, low-cholesterol diet and had an "active lifestyle" (Tr. 216). Dr. Jay opined that

2

Plaintiff's cardiac condition was stable and recommended conservative treatment (Tr. 215-16).

In March 2013, Dr. Boys noted that Plaintiff had completed radiation therapy without difficulty (Tr. 204). He had mild urethritis but no other particular problems related to the therapy (Tr. 204). Plaintiff reported that he was extremely pleased with the overall results (Tr. 204).

In June 2013, after Plaintiff complained of fatigue and a loss of energy, Dr. Jay opined that Plaintiff's cardiac issues appeared to be stable (Tr. 209-10, 232-35). A sleep study did show some hypoxia, and Plaintiff was started on supplemental oxygen (Tr. 209). Dr. Jay opined that the remainder of Plaintiff's symptoms of fatigue appeared secondary to his hormone therapy (Tr. 209).

Plaintiff returned to Dr. Boys in July 2013, after completing radiation therapy, and reported that he tolerated the therapy well (Tr. 303). Plaintiff continued on hormone therapy and complained of energy loss (Tr. 303). Dr. Boys noted that, aside from energy loss, Plaintiff had no problems at that time (Tr. 304). Plaintiff reported gardening full time and canning many vegetables during the week (Tr. 303). Plaintiff returned to Dr. Boys in November 2013 and continued to report energy issues, which Dr. Boys believed could be hormone-related (Tr. 299).

Throughout 2013, Plaintiff received treatment from his primary physician, Elliott Smith, M.D. (Tr. 314-20). Plaintiff reported severe malaise and fatigue and received a series of Vitamin B-12 injections (Tr. 315-19). Plaintiff also reported bone and joint pain, for which he received medication (Tr. 314-19).

On December 16, 2013, at the request of the state agency, Plaintiff saw Anna Palmer, M.S., and Diane Whitehead, Ph.D., for a psychological evaluation (Tr. 321-25). Plaintiff denied ever having received mental health treatment (Tr. 322). Regarding his use of medication, he said that he had taken Xanax and Prozac for about a year and Ambien for about three or four years (Tr. 322). Plaintiff reported concentration problems and a few episodes of disorientation, which Ms. Palmer and Dr. Whitehead opined did not appear to be causing significant impairment in his daily functioning on a regular basis (Tr. 323). Plaintiff discussed his daily activities with the providers, which included reading, watching television, using the computer, talking to family and friends, occasionally shopping for groceries and attending church, and some household chores (Tr. 323). Plaintiff said he was no longer able to travel to see his grandchildren in Knoxville and had not been able to go for the last few months due to physical condition (Tr. 323). He also said that he used a riding mower over the summer for very short periods of time (Tr. 323). Ms. Palmer and Dr. Whitehead opined that Plaintiff presented a moderately low level of energy and mildly limited concentration and persistence (Tr. 324). The providers concluded that Plaintiff could perform simple and somewhat detailed work and showed a satisfactory ability to interact with others in an appropriate manner (Tr. 324).

That month, state agency medical consultant Michael Ryan, M.D., reviewed the record and opined that, in an 8-hour workday, Plaintiff could lift 50

3

> pounds occasionally, lift 25 pounds frequently, stand and/or walk for about 6 hours, and sit bout about 6 hours (Tr. 63-66). Dr. Ryan also assessed postural and manipulative limitations (Tr. 63-66). In February 2014, Thomas Thrush, M.D. reviewed the record and assessed limitations equivalent to those assessed by Dr. Ryan (Tr. 78-80).
>
> In March 2014, Dr. Boys opined that Plaintiff's cancer was "completely suppressed" on hormone therapy (Tr. 376). Dr. Boys noted that Plaintiff had a "[m]ild Lupron effect of loss of energy" (Tr. 376). Dr. Boys noted that Plaintiff had tolerated radiation therapy well and had no bowel complaints and no urinary incontinence (Tr. 376).
>
> The next month, Dr. Smith completed a physician's statement form (Tr. 388-92). Dr. Smith opined that Plaintiff had been his patient since March 2007 and that he had seen Plaintiff for monthly examinations (Tr. 388). Dr. Smith indicated that Plaintiff had diagnoses of prostate cancer, severe peripheral neuropathy, high blood pressure, and degenerative disc disease (Tr. 388). Dr. Smith opined that Plaintiff had symptoms of fatigue, malaise, shortness of breath, pain the neck and knees, and persistent nausea (Tr. 388). Regarding neck pain, Dr. Smith stated that Plaintiff had undergone pain injections without much relief (Tr. 388). Dr. Smith also opined that Plaintiff had depression and anxiety (Tr. 389). Dr. Smith opined that Plaintiff could not perform even low-stress jobs because of a severe reaction to Lupron therapy (Tr. 389).
>
> Dr. Smith opined that, in an 8-hour workday, Plaintiff could stand/walk for less than 2 hours, sit for about 2 hours (Tr. 390). Dr. Smith opined that Plaintiff could occasionally lift less than 10 pounds, rarely lift 10 pounds, and never lift 20 pounds (Tr. 391). Dr. Smith also opined that Plaintiff could never climb ladders and rarely twist, stoop, crouch, and climb stairs (Tr. 391).

[Doc. 21, pgs. 2-5].

At the administrative hearing on May 16, 2014, Plaintiff testified. His testimony is also accurately summarized in the Commissioner's brief:

> He testified that his biggest problem was prostate cancer, for which he received Lupron injections every six months (Tr. 29). He said he had severe side effects from the injections, including bone pain and muscle pain (Tr. 29). He said that in 2009 he had to start "slowing up quite a bit" because of peripheral neuropathy, which he said had become more severe since he started cancer treatment (Tr. 29). He said he took Lortab for the pain, which helped (Tr. 31). He said he also had a prescription to take Oxycodone as necessary, but that he did not take it on a regular basis (Tr. 31).
>
> Plaintiff testified that he could generally walk from 300 to 500 feet at one time before he needed to stop and rest (Tr. 33). He stated that he had a problem going up a flight of stairs and that he got "real winded real quick" (Tr. 34).

4

> Plaintiff also reported concentration and memory problems, and he said that his wife had to help him with numbers on his checks (Tr. 34-36).

[Doc. 21, pg. 5].

On May 28, 2015, the ALJ issued his hearing decision, finding Plaintiff had severe impairments of a history of prostate cancer and degenerative disc disease. (Tr. 11). The ALJ considered the effects of Plaintiff's other impairments, which is required by the regulations if he finds that at least one severe impairment exists. Particularly, he considered Plaintiff's asserted problems with atrial fibrillation, sleep apnea and psychological difficulties. With respect to the heart condition and sleep apnea, he found those conditions to be under control, and that they caused no more than minimal restrictions on Plaintiff's ability to perform work activities. He noted that Plaintiff's "fatigue and lack of energy was likely secondary to Lupron (hormone treatment for prostate cancer) side effects." (Tr. 12)

Regarding Plaintiff's psychological condition, the ALJ noted that the record did not contain any evidence of outpatient treatment. Anna Palmer's and Dr. Diane Whitehead's consultative exams revealed no more than minimal limitations and indicated Plaintiff could perform both simple and detailed instructions. The ALJ noted that the state agency psychologists opined that the Plaintiff suffered from no greater than mild psychological limitations. The ALJ also found this to be the case. (Tr. 12-13). The ALJ opined that this finding was supported by the Plaintiff's daily activities "including managing his personal hygiene, running errands, reading, watching television, using the

computer, socializing with family and friends, grocery shopping, attending church, managing a bank account, and performing a variety of household chores…" (Tr. 14).

After finding that the Plaintiff did not meet any of the "listed impairments" in the regulations, the ALJ found Plaintiff retained the residual functional capacity ["RFC"] "to perform light work…except no climbing of ladders, ropes, or scaffolds and only occasional climbing of ramps and stairs… (that) the claimant can occasionally balance, stoop, kneel, crouch, and crawl, but he should not have concentrated exposure to vibration." (Tr. 14). He then pointed out that when a claimant's underlying physical or mental impairments could not be substantiated by objective medical evidence alone, the ALJ is required to make a finding on the credibility of the Plaintiff's statements "based on a consideration of the entire case record." (Tr. 15).

To do this, he first reviewed and summarized the medical evidence. In this regard, the ALJ discussed the course of Plaintiff's treatment for prostate cancer in some detail. He noted that Plaintiff had continued to complain of energy loss, which was ascribed to having Lupron injections for two years. Regarding the musculoskeletal complaints, the ALJ noted that an MRI of Plaintiff's cervical spine in 2008 revealed numerous degenerative changes, but that a nerve conduction study showed only mild sensory polyneuropathy with no evidence of radiculopathy. He noted Plaintiff had a series of epidural steroid injections. A second MRI in 2011 was said to be essentially unchanged from the 2008 MRI. The ALJ observed that the provider opined that, at that time,

6

Plaintiff's "alleged neck and upper extremity pain had traditionally resolved with steroid injections." (Tr. 15-16).

He then discussed the opinion of the Plaintiff's treating physician, Dr. Elliot Smith, as to what physical activities the Plaintiff was capable of performing. He noted that Dr. Smith opined that the Plaintiff was incapable of even a low stress job, with pain interfering with attention and concentration. He stated that Dr. Smith opined that the Plaintiff could walk less than one block or stand for more than one hour at a time, stand and walk for less than two hours and could only sit for two hours, with the need to get up and walk around or take breaks every one to two hours, rarely lift ten pounds, and only occasionally lift and carry less than ten pounds. He stated that Dr. Smith was of the opinion that the Plaintiff would miss more than four days per month due to his impairments. (Tr. 16).

He then noted that the state agency medical consultants had opined that the Plaintiff could perform medium work with some restrictions. (Tr. 16).

The ALJ then found that while Plaintiff's medically determinable impairments could be expected to cause his symptoms, Plaintiff's statements regarding the intensity and persistence of those symptoms were not credible. The first basis for finding the Plaintiff incredible was his daily activities, which the ALJ stated "are not indicative of someone who is totally disabled." (Tr. 16). He then recounted those daily activities based upon what Plaintiff told the psychological examiner, Anna Palmer. The ALJ said Plaintiff had told Ms. Palmer "that he managed his personal hygiene, ran errands, read,

watched television, used the computer, socialized with family and friends, performed occasional grocery shopping, attended church, managed a bank account, vacuumed, performed laundry duties, took out the trash, cooked, and mowed the yard with a riding lawnmower." The ALJ also noted that Dr. Boys, who treated Plaintiff throughout his recovery from prostate cancer, stated Plaintiff told him he was gardening full time and canning vegetables. The ALJ found those activities "inconsistent with the inability to perform the range of work…" described in the ALJ's RFC finding. (Tr. 16).

As another basis for finding the Plaintiff less than credible, the ALJ noted that Plaintiff had "not received the type of medical treatment one would expect given the alleged severity of the claimant's impairments." (Tr. 16). In this regard, the ALJ noted that Plaintiff underwent a series of steroid injections before his onset date and while he was still working. According to the ALJ, "the record reflects that such treatment was generally effective in controlling the Plaintiff's symptoms, and radiological imaging was negative for progressive worsening of the claimant's neck condition." *Id.* He found that "diagnostic testing revealed only mild degenerative changes and mild sensory polyneuropathy." *Id.* He noted the lack of evidence of "the services of a pain management clinic, physical therapy, orthopedic consultation, emergency room care, or surgical intervention for his allegedly disabling musculoskeletal pain." *Id.*

The ALJ then discussed the opinion evidence. He gave great weight to the consultative psychological examiners and the state agency psychologists. With regard to the consultative examiners, the ALJ noted they "had the benefit of evaluating the

8

claimant first-hand…" (Tr. 17). He gave some weight to the state agency physicians, apparently because they opined that the Plaintiff could do medium work while the ALJ only believed the evidence supported a finding that he could do only light work. His entire finding on the weight ascribed to the Plaintiff's treating doctor, Dr. Smith, was that "little weight is also afforded to the opinion of Dr. Elliot [sic] as it is inconsistent with and not supported by the record as a whole." *Id.*

After reiterating that the Plaintiff worked when his musculoskeletal condition was no worse than it was after he quit working, the ALJ found that all of the Plaintiff's credible complaints are addressed in his RFC finding. *Id.*

The ALJ then found that the Plaintiff could return to his past relevant work as a sales and marketing representative, noting that the VE testified that this job required light exertion as it is generally performed and is skilled vocationally. The ALJ then noted that even though he found the Plaintiff had no mental impairment, even assuming Plaintiff had the "additional limitation to carrying out simple and detailed tasks," the VE still testified Plaintiff could perform his past relevant work. The Court is not sure how this would constitute an additional limitation as being able "to carry out simple and detailed tasks" presents no limitation whatsoever for carrying out tasks. This covers the *entire* array of mental ability needed to carry out *any* task. But in any event, the ALJ found that the Plaintiff was not disabled through the date his insured status expired. *Id.*

Plaintiff asserts that the ALJ erred in two respects. First, Plaintiff alleges that the ALJ erred in failing to assign proper weight to the opinion of Dr. Elliot Smith, the

9

Plaintiff's treating physician who is board certified in internal medicine. Second, he alleges that the ALJ erred in finding Plaintiff not to be entirely credible regarding his testimony regarding the extent of his limitations.

20 C.F.R. § 404.1527(c) sets forth the procedure the Commissioner will use in evaluating opinion evidence in disability insurance benefit cases. Section (c)(2) states that "[g]enerally, [the Commissioner] give[s] more weight to opinions from [the claimant's] treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." If such evidence from a treating source "is well-supported by medically diagnostic techniques and is not inconsistent with the other substantial evidence in your case, [the Commissioner] will give it controlling weight." If the treating source is not given controlling weight, the Commissioner notes that it "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."

Section (c)(2)(i) provides that a treating source will be given more weight than a non-treating source if "the treating source has seen [the claimant] a number of times and long enough to have obtained a longitudinal picture of [the claimant's] impairment." Section (c)(2)(ii) provides that "the more knowledge a treating source has about [the

10

claimant's] impairment(s) the more weight [the Commissioner] will give to the source's medical opinion." Understandably, section (c)(3) provides that "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight [the Commissioner] will give that opinion." Finally, under section (c)(5) the Commissioner gives a specialist generally more weight than a non-specialist on opinions within their area of expertise.

The treating physician rule set forth in this regulation was recently discussed in *Gayheart v. Commissioner of Soc. Sec.*, 710 F.3d 365 (6th Cir. 2013). In that case, the Sixth Circuit remanded the matter for reconsideration, finding that the ALJ did not correctly weigh the medical opinions as required by 20 C.F.R. § 404.1527(c). Under the regulations, Social Security Rulings, and case law, the Court stated that

> treating-source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.' 20 C.F.R. § 404.1527(c)(2). If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.*, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence., *id.* § 404.1527(c)(2)-(6).

*Gayheart*, *supra*, at 376.

The Court noted that the ALJ accorded little weight to the opinion of the plaintiff's long time treating psychiatrist, but instead relied upon consulting examining

11

psychologists and one who testified at the hearing as a medical expert.  While the ALJ found that the opinion of the treating psychiatrist did not meet either prong to be accorded controlling weight, (that is, that it be well-supported by medically acceptable techniques and not be inconsistent with the other substantial evidence), the Court found the ALJ failed to justify his reason for doing so. This Circuit "does not hesitate to remand where the Commissioner has not provided good reasons for the weight given to a treating physician's opinion." *Gayheart*, 710 F.3d at 380 (quotation omitted).

After his failure to accord the treating psychiatrist controlling weight, the ALJ failed to give adequate reasons for the lack of weight he gave her opinion when comparing her opinions to those of the non-treating sources to which he gave great weight.  The Court stated that the ALJ's "failure to provide 'good reasons' for not giving (the treating psychiatrist) controlling weight hinders a meaningful review of whether the ALJ properly applied the treating-physician rule that is at the heart of this regulation." *Id.* at 377 citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir.2004).

Mainly, the Sixth Circuit found that "the ALJ [did] not identify the substantial evidence that is purportedly inconsistent with (the treating psychiatrist's) findings." *Id.* at 377.  The Court then made an interesting observation regarding what evidence is necessary to discard the treating physician's opinion:

> Surely the conflicting substantial evidence must consist of more than the medical opinions of the nontreating and nonexamining doctors.  Otherwise the treating-physician rule would have no practical force because the treating source's opinion would have controlling weight only when the other

12

> sources agreed with that opinion. Such a rule would turn on its head the regulation's presumption of giving greater weight to treating sources because the weight of such sources would hinge on their consistency with nontreating, nonexamining sources."

*Id.* Likewise, the Court found that "the ALJ's focus on isolated pieces of the record is an insufficient basis for giving...little weight" to the treating psychiatrist under 20 C.F.R. § 404.1527(c). *Id.* at 378. These included occasional activities of the plaintiff and clinic note references of the psychiatrist to the plaintiff looking forward to being outside and planning to buy a new lawnmower blade. *Id.* at 377. The Court also criticized the ALJ for placing the opinion of the treating psychiatrist under more scrutiny than those of the non-treating sources to which he ascribed greater weight.

Thus, in the post-*Gayheart* world, there must be more than the contrary opinion of a state agency physician to overcome an opinion of a treating physician. The reasons for not giving full weight to the treating source must be more than a generalized lack of support "in the record as a whole." Otherwise, the reviewing court cannot make any judgments about whether the ALJ properly applied the treating physician rule. This can, of course, be provided by specific reference to medical evidence, other than non-examining or consultative sources, which undercut the treating source's opinion. Often, that is found in the treating sources own records. For example, office notes showing normal findings followed by an opinion contrary to those normal findings can suffice as a legitimate basis for giving little weight to a doctor's opinion as can contrary statements by a claimant to other medical sources or in the adjudicative process.

13

In the present situation, although the ALJ gave reasons for not finding Plaintiff credible, he did not say they were the reasons for only giving little weight to the opinion of Dr. Smith, the treating physician. He basically said that the Plaintiff's daily activities did not support his credibility, and presumably Dr. Smith's opinion. Also, he said that the Plaintiff's treatment history was not indicative of someone who was totally disabled, and once again, it can be inferred that this was a reason for the weight given to Dr. Smith.

The problem with the Plaintiff's presumed daily activities in which the ALJ places such great reliance is that, for the most part, they are inaccurate paraphrases of what Plaintiff actually reported, most of it during his psychological evaluation by Ms. Palmer. For example, the ALJ found that the Plaintiff managed his personal hygiene. He did tell Ms. Palmer he showers and gets dressed (Tr. 323). However, in his Adult Function Report he submitted in December of 2013, he stated that he dressed with difficulty if at all and tried to shower two to three times per week. He said he would try to wash his hair if he felt like it and that sometimes his wife had to help him clean himself after bowel movements (Tr. 158). The ALJ found that the Plaintiff ran errands. Plaintiff told Ms. Palmer that he "may go run errands for a short period of time." (Tr. 323). The ALJ correctly noted that the Plaintiff read, watched television and got on the computer, which are things he reported to Ms. Palmer. *Id.* However, these are not activities which indicate a capacity for work. In fact, he indicated he spent much time watching television or reading (Tr. 158).

14

The ALJ said that the Plaintiff socialized with family and friends. This presumably also came from Ms. Palmer's report. However, he told her that he talks to family and friends when they visit and could no longer travel to Knoxville to see his grandchildren. *Id.* at 34, 158. The ALJ stated that the Plaintiff performed occasional grocery shopping, attended church, and managed a bank account. Plaintiff did tell Ms. Palmer that he occasionally shops for groceries, but said that while he used to attend church services, he had not been able to for several months due to his physical condition. *Id.*

Plaintiff also told Ms. Palmer that he is responsible for paying bills, but that he has his wife check every check he writes. *Id.* He also testified to that at the administrative hearing (Tr. 35). The ALJ stated Plaintiff vacuumed, did laundry, took out the garbage and cooked. However, the only cooking was making a sandwich or heating something up in a microwave. (Tr. 159). The ALJ also stated that the Plaintiff mowed with a riding mower. However, Ms. Palmer stated that Plaintiff only mowed for very short periods of time and was not sure if he will be able to do so in the future (Tr. 323).

Frankly, none of these daily activities indicate anything about an individual's ability to do light work, particularly the requirement of standing or walking for six hours out of an eight hour work day. It is true that the Plaintiff received fairly conservative treatment for his musculoskeletal pain and his neuropathy and fatigue. However, regarding his physical pain, that treatment consisted of Lortab and Oxycodone. Likewise, the Court is unsure what treatment was available for his neuropathy and

15

accompanying weakness. He was receiving monthly B-12 shots from Dr. Smith in an attempt to give him more energy following his treatment for prostate cancer.

In the final analysis, the Court does not believe that the ALJ has offered sufficient reasons for giving little weight to Dr. Smith's opinion. The Court finds the Commissioner's position is not substantially justified.

That being the case, under *Gayheart,* the opinions of the state agency physicians is not sufficient by themselves to overcome the opinion of Dr. Smith, an internal medicine specialist who sees Plaintiff on a monthly basis, with office notes from at least 16 visits in the record. Mr. Smith is 64 years of age. The Court recommends that the case be remanded to the Commissioner for a consultative examination to further understand the extent of his physical impairments. Therefore, it is respectfully recommended that the Plaintiff's Motion for Judgment on the Pleadings [Doc. 15] be GRANTED, and that the Defendant Commissioner's Motion for Summary Judgment [Doc. 20] be DENIED.[1]

                                                      Respectfully submitted,

                                                       s/ Clifton L. Corker
                                                      United States Magistrate Judge

---

[1] Any objections to this report and recommendation must be filed within fourteen (l4) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).